# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BASELINE CONTRACTING, INC.** | : | **CIVIL ACTION** |
| **and SITELINE SERVICES, INC.,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **NO. 12-2350** |
| | : | |
| **CINCINNATI INSURANCE, and** | : | |
| **CINCINNATI INDEMNITY CO.,** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                      **August  20, 2015**

Plaintiffs, Baseline Contracting, Inc. and Siteline Services, Inc. (collectively "Plaintiffs") filed this action for breach of contract and fiduciary duties against Defendants Cincinnati Insurance and Cincinnati Indemnity Company (collectively "CI"). Plaintiffs allege that CI exercised control of the defense and settlement of workers' compensation insurance ("WCI") claims filed against it by its employees, including control over the retention of defense counsel.  Count I of Plaintiffs' Amended Complaint alleges that CI breached its duties when it settled claims in amounts lacking justification and/or a factual basis, without consulting them or considering the effects of such settlements on Plaintiffs' WCI premiums.  (Am. Compl. ¶¶ 39-40.)  Count II seeks a declaratory judgment that CI's inclusion of fringe benefits in the calculation of Plaintiffs' general liability ("GL") coverage premium bases was contrary to law and public policy. (Id. ¶ 47.)  CI has filed a Counterclaim for breach of contract and unjust enrichment, asserting that Plaintiffs have failed to pay premiums due on the various policies issued to

them totaling $132,484.  (Countercl. ¶ 18.)  Plaintiffs have answered the Counterclaim, asserting affirmative defenses that CI breached the agreements it seeks to enforce, thereby excusing Plaintiffs' performance.  Presently pending are the parties' cross-motions for summary judgment.  Each party has filed a Statement of Undisputed Facts and a Response to the opposing party's Statement.  For the reasons that follow, I deny Plaintiffs' Motion.  CI's Motion is granted in part and denied in part.

## I.  THE SUMMARY JUDGMENT RECORD

CI asserts that the following facts in support of its cross motion for summary judgment are undisputed.  I will note Plaintiffs' objections where appropriate.

1.  CI issued WCI Policy No. WC 8999438-06 to Baseline for the period April 1, 2010 to April 1, 2011.  (DSOF Ex. 1.)

2.  CI issued WCI Policy No. WC 2100834-05 to Siteline for the period April 1, 2010 to April 1, 2011.  (DSOF Ex. 2.)

3.  CI issued CP Policy No. CPP 0814631 to Baseline and Siteline for the period April 1, 2010 to April 1, 2011.  (DSOF Ex. 3.)

4.  Baseline commenced a lawsuit against Defendants in the Court of Common Pleas of Lehigh County, Pennsylvania on February 23, 2012.

5.  Defendants filed a Notice of Removal on May 1, 2012.

6.  Plaintiffs filed an Amended Complaint ("Amended Complaint") on July 23, 2012. In it they allege breach of contract and fiduciary duty (Count I) and request a declaratory judgment under 28 U.S.C. §2201 (Count II).  (See Docket Entry 12.)

7.      Defendants filed their Answer, Affirmative Defenses and Counterclaims ("Counterclaim") on August 2, 2012.  The Counterclaims allege breach of contract and unjust enrichment for premiums owed and past due in the amount of $132,484.  The terms and conditions of the Plaintiffs' Workers' Compensation Policies and Commercial Package Policy include Plaintiffs' agreement to pay premiums.  The premiums were to be ultimately calculated based on audits of Plaintiffs' payroll and sales records.  (See Docket Entry 14.)

8.      Plaintiffs filed their Answer and Affirmative Defenses ("AAD") to Defendants' Counterclaims on August 22, 2012. (See Docket Entry 16.)

9.      CI is a licensed property casualty insurance provider.  It is a member of the Pennsylvania Compensation Rating Bureau ("PCRB").  (See Countercl. ¶ 2; AAD ¶ 2.)

10.     Alfred F. Bauer, Jr. has been Baseline's President and owner since it was founded in 1996.  He has been Siteline's Secretary/Treasurer since it was founded in 1999. (DSOF Ex. 4, Aug. 15, 2013 Dep. of Alfred Bauer ("Bauer Dep.") at 12:19-13:17, 14:12-18, 18:24-19:3.)

11.     Mr. Bauer was involved in procuring Plaintiffs' insurance coverage.  He was also involved in specific workers compensation claims at issue here.  (See id. at 17:19-18:1.)

12.     Kim Niswender has served as Baseline's office manager since 1996.  She has been Siteline's office manager since its formation in 1999.  She is Baseline's Assistant Secretary.  (DSOF Ex. 5, Oct. 3, 2013 Dep. of Kim Niswender ("Niswender Dep.") at 10:11-13, 13:25-14:18, 17:8-14, 18:12-19:24.)

13.     Mr. Bauer understood that CI provided Plaintiffs with the best coverage possible at the best prices.  His companies maintained policies from CI through 2011.  (<u>See</u> Bauer Dep. at 55:15-19; <u>see also</u> Niswender Dep. at 28:22-30:5.)

14.     Until 2010, Plaintiffs paid certain premiums directly to their insurance broker, HMK.  (<u>See</u> Niswender Dep. at 23:21-24:12, 27:20-24, 28:22-30:5, 45:6-11.)

15.     Since 1999, the CI policies had audited premiums.  The final WCI premium amount due from Plaintiffs resulted from audits of the Plaintiffs' actual payroll information.  The final GL premium amount due from Plaintiffs resulted from audits of the Plaintiffs' payroll expenditures.  In some years, the audit resulted in refunds on the initial premiums paid at the outset of the coverage.  (<u>See</u> Niswender Dep. at 45:17-51:19, 90:2-22, 93:18-96:1.)

16.     After the 2010 audit, Baseline paid an additional premium due of $12,998 for the CP Policy.  This payment went to HMK.  At that time, Baseline received a return of premium for its WCI Policy of $304.  Furthermore, Siteline paid an additional premium of $13,168 for its WCI Policy.  (<u>See</u> Niswender Dep. at 89:20-90:18, 92:24-93:23, 95:6-9, 96:10-15.)

17.     After the 2011 audit, premium audit statements were issued by CI to Plaintiffs through HMK.  Those statements reflected that Baseline owed an additional premium of $758 for its 2010-2011 WCI Policy, Siteline owed an additional premium of $88,039 for its 2010-2011 WCI Policy, and Baseline and Siteline owed an additional premium of $43,687 for the 2010-2011 CP Policy.  (<u>See</u> DSOF Ex. 6, Aff. of Bill Jansen; DSOF Ex. 7, Niswender Dep. Ex. Kim-2.)

4

18.     After the 2011 audit, Plaintiffs received three letters from HMK dated July 15, 2011.  Those letters stated that Baseline and Siteline owed additional premiums in the amounts reflected in the premium audit statements.  Those amounts were $758, $88,039 and $43,687.  (Niswender Dep. Ex. Kim-2; see also Niswender Dep. at 96:16-100:7, 105:21-106:14.)

19.     The three HMK letters included the premium audit statements issued by Defendants.  (See Jansen Aff.; Niswender Dep. Ex. Kim-2.)

20.     Ms. Niswender, in her role as office manager, received the three July 15, 2011 letters from HMK in the regular course of business.  This was Plaintiffs' first notice that these additional premiums were owed.  (See DSOF Ex. 6; see also Niswender Dep. at 14:3-6, 16:20-22, 25:14-19, 96:10-100:7, 105:21-106:14, and 108:10-14.)

21.     Upon receipt of HMK's three letters, Niswender understood that the audit had been completed and the additional premiums were based on actual payroll exposures, derived from the audited payroll figures.  She also understood that those payroll figures were higher than those used for the estimated payroll figures in certain job classifications.  Niswender stated that, although she had no reason to believe that the initial, estimated premium was incorrectly calculated or that the audit was performed incorrectly, she believed that certain underlying data used in those calculations was inaccurate.  (See Niswender Dep. at 97:21-108:3, 130:16-133:25.)

22.     Both Niswender and Bauer received and read a September 6, 2011 letter from CI.  This was done in the regular course of their business.  That letter stated that Plaintiffs' broker HMK asked CI to collect the total amount of $132,484 directly from Plaintiffs.

(See  DSOF Ex. 8; Niswender Dep. at 14:3-6, 16:20-22, 25:14-19, 108:15-109:6; see also

Bauer Dep. at 110:13-111:21.)

23.    Mr. Bauer did not respond to Defendants' September 6, 2011 letter.  (See Bauer

Dep. at 111:13-15.)  However, he responded to the content of the letter through email and

phone conversations with CI employee Amy Hacker.  (See id. at 98:17-99:6, 99:20-

100:17.)

24.    Ms. Niswender and Mr. Bauer each received and read a January 6, 2012 letter

from Thomas McMackin, Esquire.  Mr. McMackin is an attorney who represented CI in

efforts to collect the unpaid $132,484 additional premium.  Ms. Niswender and Mr.

Bauer received the January 6, 2012 letter in the regular course of their business.  That

letter stated that Plaintiffs' additional premiums remained unpaid in the amount of

$132,484.  (DSOF Ex. 9, Bauer Dep. Ex. Bauer-5; see also Bauer Dep. at 111:22-112:14;

see also Niswender Dep. at 14:3-6, 16:20-22, 25:14-19, 112:24-113:16.)

25.    Mr. Bauer did not respond to Mr. McMackin's January 6, 2012 letter.  (See Bauer

Dep. at 112:15-17; see also Niswender Dep. at 13:17-21.)

26.    Plaintiffs have stipulated that $132,484 was the amount listed as due and this

amount has not been paid.   (See Niswender Dep. at 109:9-15, 109:25-110:1.)

27.    Plaintiffs have never paid the $132,484.00 premium amount that resulted from the

2011 premium audit.  (See Bauer Dep. at 111:16-21; see also Niswender Dep. at 108:4-9,

109:21-23.)

28.    Mr. Bauer and Ms. Niswender acknowledge that an insurance policy between

insurer and insured is a binding, mutual agreement between the parties and that insurance

coverage afforded is supplied in exchange for premiums paid by the insured.  (<u>See</u>  Bauer

Dep. at 113:9-114:10; <u>see also</u> Niswender Dep. at 120:6-121:8.)

29.     Plaintiffs also acknowledge that CI provided WCI Policies and a CP Policy to

Plaintiffs for the period April 1, 2010 - April 1, 2011, and those insurance policies were

binding contracts between Plaintiffs and Defendants.  (<u>See</u>  Niswender Dep. at 122:2-14.)

30.     Mr. Bauer is familiar with provisions in Plaintiffs' WCI Policies and CP Policy.

He understood that Plaintiffs were to pay premiums when due, and he understood it was

CI's position that Plaintiffs owed their outstanding additional premiums.  (<u>See</u> Bauer

Dep. at 110:13-111:21.)

31.     CI asserts as a fact that Plaintiffs entered into valid and fully enforceable contracts.

(<u>See</u> Am. Compl. ¶ 10; Countercl. ¶ 10; <u>see also</u>  Niswender Dep. at 28:9-30:19.)

Plaintiffs deny this allegation as constituting a legal conclusion.

32.     In those agreements, Defendants agreed to insure Plaintiffs, and Plaintiffs agreed

to pay premiums.  (<u>See</u> Bauer Dep. at 113:9-114:10.)

33.     The parties do not dispute the existence of an insurance contract and its provisions.

(<u>See</u>  Bauer Dep. at 113:9-114:10; <u>see also</u> Niswender Dep. at 109:9-15, 109:25-110:1,

120:6-122:14.)

34.     CI asserts that premiums for WCI coverage are based in part on the classification

of the type of business, its annual payroll, and claims history.  (<u>See</u> Am. Compl. ¶ 15;

Countercl. ¶ 15.)  Plaintiffs respond that premiums are also based on the company's prior

"experience modification" or claims history.

35.     Experience Modification Factors ("EMF" or "EMFs") are a mathematical calculation generated by the PCRB.  (See Bauer Dep. at 39:21-40:6, 41:1-8.)  Plaintiffs deny this assertion as stated, but concede that EMFs are derived by using a mathematical calculation generated by the PCRB.

36.     Plaintiffs' EMFs were based on Plaintiffs' respective workers' compensation history or "experience" over the course of three policy years prior to the year to which the EMF is applied.  (See Am. Compl. ¶¶ 22, 24.)

37.     The EMF calculations used for Plaintiffs' premiums utilized loss data from three policy years prior to the year in which the EMF was applied.  Mr. Bauer and Ms. Niswender stated that they understood generally that loss data from three policy periods prior to the relevant policy period is applied to the EMF for that relevant policy period. (See Bauer Dep. at 63:14-25; see also  Niswender Dep. at 55:16-56:25.)

38.     Plaintiffs identified five specific WCI claims in discovery that Plaintiffs assert were mishandled: William Booth; Michael Reinoehl; Jeffrey Moser; Leo Schappe; and Frank Calabro.  (See Bauer Dep. at 57:19-58:15.)

39.     Workers' compensation claimant William Booth's date of injury was May 21, 1999. Mr. Booth's workers' compensation claim was settled in September 2000. (See Bauer Dep. at 60:20-61:7, 117:2-11.)

40.     Workers' compensation claimant Michael Reinoehl's claim was settled in October 2003.  (See Bauer Dep. at 117:16-20.)

41.     Workers' compensation claimant Jeffrey Moser's claim was settled on March 22, 2004.  (See Bauer Dep. at 117:21-24, 157:2-5.)

42.     Mr. Bauer testified that his knowledge of alleged claims mishandling for the William Booth, Michael Reinoehl, and Jeffrey Moser claims was gained either during the active handling of the claim or upon its settlement.  (See Bauer Dep. at 119:3-25 ("[I]t was a slam dunk and the [Booth] settlement that I saw was the first settlement that I had seen in any kind of number like that.  It wasn't anything that I considered to be a slam dunk."), 120:12-121:9, 134:14-135:18 ("[The Reinoehl claim] was settled for a large amount and the bottom line is it smelled just like the other one."), 146:20-147:2, 147:22-148:8 ("But is it fair to say that you did receive status updates on the Reinoehl claim, correct?  Some of it yes.  When you received these, did you read them? Yes."), 153:15-155:15 ("There was never any accident or incident that caused this. . . .  [S]o we knew from the beginning [the Moser claim] was bogus.").)

43.     Therefore, CI asserts, Mr. Bauer knew of any alleged claims mishandling at the time of the respective settlements of the William Booth, Michael Reinoehl, and Jeffrey Moser claims.  (See Bauer Dep. at 119:3-25, 120:12-121:9, 134:14-135:18, 146:20-147:2, 147:22-148:8, 153:15-155:15.)

44.     Ms. Niswender testified that she knew how EMF calculations were derived from her work over the years, and that her knowledge grew over that time.  (See Niswender Dep. at 57:17-58:21.)

45.     At the latest, Mr. Bauer understood in 1999-2000 that EMF calculations for the Plaintiffs utilized loss data from three policy years prior to the year to which the EMF was applied.  (See Bauer Dep. at 63:14-64:7, 117:2-15.)

46.     At the time the Booth claim settled in 2000, Mr. Bauer believed that the handling of that workers' compensation claim and its outcome could affect Plaintiffs' insurance premiums based on the EMF.  (See Bauer Dep. at 61:8-15, 63:8-13, 117:2-11.)

47.     Settlement of the William Booth, Michael Reinoehl and Jeffrey Moser claims did not affect Plaintiffs' EMF for more than three years after each respective claim settled. Mr. Bauer has no knowledge or information to conclude that the settlement of the William Booth, Michael Reinoehl and Jeffrey Moser claims affected Plaintiffs' premiums for the policy period of April 1, 2010 through April 1, 2011.  (See Bauer Dep. at 118:1-12.)

48.     CI asserts that Plaintiffs' knew of the alleged claim of mishandling of workers' compensation claims accrued either prior to or at the time of settlement of the William Booth, Michael Reinoehl and Jeffrey Moser claims, the latest of which was settled in March 2004.  (See Bauer Dep. at 119:3-25, 120:12-121:9, 134:14-135:18, 146:20-147:2, 147:22-148:8, 153:15-155:15.)  Plaintiffs deny this assertion as constituting a legal conclusion.

49.     As of March 2004, both Mr. Bauer and Ms. Niswender understood that the handling and outcome of workers' compensation claims could affect Plaintiffs' insurance premiums based on the EMF.  (See Bauer Dep. at 63:8-64:7; see also  Niswender Dep. at 55:16-56:13, 57:17-58:21.)  Plaintiffs admit this assertion as to Bauer, but deny it as to Niswender.

50.     From 1999-2009, the audits included the Plaintiffs' employees' prevailing wages but excluded the value of direct cash fringe benefits ("DCFB") when calculating

Plaintiffs' respective payroll expenditures for purposes of determining CP Policy premiums.  (See Bauer Dep. at 96:17-97:10.)

51.    CI began to include the value of DCFB in payroll expenditures in their 2009 audit. Plaintiffs did not recognize that this change had occurred until the 2010 audit.  (See Bauer Dep. at 97:1-19.)

52.    Mr. Bauer testified that insurance codes that he read indicated that the value of DCFB should not be used in premium calculation.  He was unable to identify these insurance codes, but stated that he gave that information to CI's Premium Audit Collections Specialist Amy Hacker.   (See Bauer Dep. at 100:14-101:23.)

53.    Ms. Niswender testified that, in the regular course of business as the office manager of Plaintiffs, she was copied on a forwarded August 31, 2011 email from Defendants' Senior Field Auditor Chet Cooke to Alfred Bauer.  At that time she read the email along with a "Just the FAQ's" attachment from ISO Property Services.  That attachment addressed the question of whether DCFB should be included in the calculated premium base for general liability.  (DSOF Ex. 10, Niswender Dep. Ex. Kim-3; see also Niswender Dep. at 14:3-6, 16:20-22, 25:14-19, 139:24-140:20, 144:6-145:1.)

54.    Mr. Bauer acknowledged receiving this email and its attachment from Defendants' auditor Chet Cooke.  (See Bauer Dep. at 97:23-98:7.)

55.    Cooke stated in his email that DCFB are specifically addressed in the PCRB's Pennsylvania Workers' Compensation Manual, and are to be excluded from workers compensation premium calculations, subject to certain criteria inapplicable here.  Mr. Cooke concluded that the PCRB's Pennsylvania General Liability Manual did not

specifically address DCFB.  He believed that, because they are not specifically excluded, they should be included as remuneration/wages and should be included in the premium base for GL insurance.  This conclusion is supported by the "Just the FAQ's" attachment from ISO Property Services provided to Plaintiffs.  (See DSOF Ex. 10, Niswender Dep. Ex. Kim-3.)

56.    Ms. Niswender testified that she did research herself about whether DCFB should be included or excluded in the calculations of GL premiums.  She was not able to find whether or not they should be applied for premium purposes because she was only able to find this information in regard to workers' compensation.  (See  Niswender Dep. at 145:5-146:1.)

57.    Mr. Bauer emailed Amy Hacker on September 12, 2011.  In that email, he addressed the change in audit procedures to include the value of DCFB in the premium base for GL insurance.  Mr. Bauer received an email response from Ms. Hacker on October 24, 2011.  Mr. Bauer did not respond to Ms. Hacker.  (See Bauer Dep. at 99:1-101:25; DSOF Ex. 11, Bauer Dep. Ex. Bauer-2).

58.    In her letter, Amy Hacker reiterated much of the same information provided by Chet Cooke in his August 31, 2011 email to Mr. Bauer.  Ms. Hacker asserted that, in previous years, the subtraction of DCFB out of the GL insurance payroll calculation was an error.  Once Mr. Cooke realized his error he began accounting for that data in the correct way and the DCFB were correctly included in the 2010-2011 audit.  (See  DSOF Ex. 11.)  The previous errors were to Plaintiffs' benefit.

Plaintiffs claim in their summary judgment motion that the following facts are undisputed.  After each statement, I will note CI's responses where appropriate.

1.      Plaintiffs are each Pennsylvania corporations, and each Plaintiff's principal place of business is located at 2800 Quarry Street, Coplay, Pennsylvania 18037.  (Am. Compl. ¶ 1; Countercl. ¶ 1.)

2.      Defendants, Cincinnati Insurance and Cincinnati Indemnity Company are each corporations organized under the laws of the state of Ohio, with their principal place of business located at 6200 South Gilmore Road, Fairfield, Ohio 45014.  (Am. Compl. ¶ 2; Countercl. ¶ 2.)

3.      Defendants are each subsidiaries of The Cincinnati Financial Corporation, an Ohio corporation.  (Am. Compl. ¶ 3; Countercl. ¶ 3.)

4.      Baseline and Siteline are heavy and highway general contractors, with special emphasis on public works projects, including bridge and road construction.  (See PSOF Ex. A, Oct. 3, 2013 Dep. of K. Niswender ("Niswender Dep.") at 32:18-19; PSOF Ex. B, List of Completed Projects, 1996-2011 ("1996-2011 Project List").)  The majority of these public works projects were with the Pennsylvania Department of Transportation. (See 1996-2011 Project List.)

5.      From early 1998 through March 2011, Baseline was covered under WCI and CP policies issued by CI.  (Niswender Dep. at 27:25-28:3, 28:22-29:3.)

6.      From early 2000 through March 2011, Siteline was covered under WCI and CP policies issued by CI.  (Niswender Dep. at 28:22-29:15.)

7.     For each year that CI issued insurance coverage to Plaintiffs, the CP policies contained GL insurance as a component of coverage, with provisions for such coverage contained in a GL coverage part.  (Am. Compl. ¶ 10; Countercl. ¶ 10.)

8.     While the provisions of the WCI policies were rewritten on an annual basis, many of the CP polices were marketed as three-year policies, with the rates locked in for three years, with annual premiums, and annual renewals of coverage.  (Niswender Dep. at 30:16-31:13.)  CI additionally notes that while these policies had stated annual premiums, they were subject to audited premium agreements.  (See Ex. 5 to Defs.' Mot. (G/A Policy 101 12 04 at Section IV, Commercial General Liability conditions, ¶ 6).)

9.     All of the insurance policies issued by CI to Plaintiffs were drafted exclusively by CI.  (Am. Compl. ¶ 11; Countercl. ¶ 11.)

10.     During the time when Plaintiffs were covered by CI, the expiration date/renewal premium payment deadline for each insurance policy written on an annual basis was April 1; this also was the renewal premium payment deadline for each CP policy written on a three-year basis.  (PSOF Ex. C, Decl. of Alfred F. Bauer, Jr. Pursuant to 28 U.S.C. § 1746 ("Bauer Decl.").)

11.     During the time when Plaintiffs were covered by CI policies, Plaintiffs were parties to, performed on, and completed public works projects.  These projects entailed work performed pursuant to contracts with public entities, or which otherwise received federal, state, and/or local financial assistance.  (See 1996-2011 Project List.)

12.     Each WCI policy that CI issued to Plaintiffs obligated CI to provide both Plaintiffs a minimum of 30 days' notice prior to the effective date of a premium increase and a

14

minimum of 60 days' notice prior to the effective date of CI's nonrenewal of the policy.
(See PSOF Ex. D, 2010-11 WCI Policy Endorsement WC37603A ("WCI Policy Notice
Provisions").)

13.     With the exception of endorsement dates, policy numbers, the named insured, and
the insurance company name, the provisions of Endorsement WC37063A are identical
for every WCI policy that Plaintiffs had with CI.

14.     With respect to policy nonrenewal, each WCI policy specified that "[m]ailing that
notice to you at your mailing address last known to us will be sufficient to prove notice."
(See id.)

15.     As a common policy condition for each part of each respective CP policy that CI
issued to Plaintiffs, CI was obligated to provide both Plaintiffs a minimum of thirty (30)
days' notice prior to the effective date of a premium increase and a minimum of sixty
(60) days' notice prior to the effective date of CI's nonrenewal of the policy.  (See PSOF
Ex. E, 2010-11 CP Policy Endorsement IA4111PA1109 ("CP Policy Notice
Provisions").)

16.     The provisions of Endorsement IA4111PA1109 are identical to the endorsements
setting out provisions for notice of nonrenewal and premium increase in every CP policy
Plaintiffs had with CI prior to the 2010-11 CP Policy.

17.     With respect to both premium increases and policy nonrenewal, each such CP
policy specified:  "Any notice of nonrenewal or renewal premium increase will be mailed
or delivered to the first Named Insured's last known address.  If notice is mailed, it will

be by registered or first class mail.  Proof of mailing will be sufficient proof of notice."

(See id.)

18.     The nonrenewal/premium-increase notification language of each WCI policy was titled "PENNSYLVANIA ACT 86-1986 ENDORSEMENT NONRENEWAL, NOTICE OF INCREASE OF PREMIUM, and RETURN OF UNEARNED PREMIUM."  (See WCI Policy Notice Provisions.)  Plaintiffs assert, but CI denies, that the language specified that Endorsement WC370603A was designed to comply with the provisions of "Pennsylvania Act 86-1986."  (See PSOF Ex. J, WCI Policy Notice Provisions ("This endorsement applies only to the insurance provided by the policy because Pennsylvania is shown in Item 3.A of the Information Page"); see also 2010-11 WCI Policy Endorsement 1A4189PA0499 (advising CI is "required by state statue to provide you with notice your renewal/anniversary premium may increase").)

19.     The nonrenewal/premium increase notification language of each above-mentioned common policy condition in each CP policy specified that such language pertained to "Pennsylvania Changes – Cancellation and Nonrenewal."   (See generally CP Policy Notice Provisions.)

20.     Pennsylvania General Assembly Act 86-1986, titled "An Act requiring notice of rate increases, policy cancellations and nonrenewals by property and casualty insurers," became effective July 3, 1986, and is codified, as amended, at Chapter 14 of Title 40 of the Pennsylvania Statutes.  See 40 P.S. §§ 3401, et seq.

21.     During the years in which Plaintiffs had insurance coverage with CI, Plaintiffs

never received any notice of nonrenewal or of a renewal premium increase, whether by

registered or first-class mail or in any other form.  (Bauer Decl. ¶¶ 5-6.)

22.     Plaintiffs did not receive any notice of an increase in their insurance renewal

premiums for the 2011-12 policy period.  (Id. ¶ 7.)

CI admits Plaintiffs did not receive any notice of an increase of premium for the

2011-12 policy period, but asserts that it was not required to send such a notice because it

had conveyed to Plaintiffs' insurance broker that CI no longer preferred to write these

types of insurance to companies involved in road construction contracting.  (See Defs.'

Resp. to PSOF, Ex. 4, Aff. of Karl Runkle, and emails attached as Ex. A thereto.)  CI

conveyed these views to Plaintiffs' insurance broker, HMK.  (See id.; Def. Resp. to

PSOF, Ex. 2, Aff. of Amy Hacker, October 13, 2011 email string attached as Ex. C

thereto.)  This was done at least one year in advance of the April 1, 2011 renewal date for

the 2011-2012 period.  (See Runkle Aff. Ex. A.)  CI asserts that it repeatedly informed

HMK of this preference.  (See id.)  This was done as early as March 2010.  (See id.).  CI

asked HMK to move Plaintiffs' WCI Policies to a different insurer prior to the renewal

for the 2011-12 policy period.  (See id.)  CI had also repeatedly asked HMK as early as a

May 27, 2010 in writing to move Plaintiffs' CP Policy to a different insurer prior to the

renewal for the 2011-12 policy period.  (See Hacker Aff. Ex. C; Runkle Aff. Ex. A.)

Approximately 90 days prior to April 1, 2011, Plaintiffs' broker HMK requested

by telephone that CI not issue a "nonrenewal" notice to Plaintiffs.  (See Hacker Aff. Ex.

C; Hacker Aff. Ex. D (October 24, 2011 A. Hacker Email to A. Bauer).)  CI asserts that it

had a legitimate basis to issue a notice of "nonrenewal" at that time and was prepared to

do so.  (See Hacker Aff. Exs. C, D; Runkle Aff. Ex. A.)  However, HMK explained that a

"nonrenewal" notice on Plaintiffs' record could adversely affect Plaintiffs when they

sought WC and GL coverage from other insurers.  (See Hacker Aff. Exs. C, D.)  As a

result, HMK asserted that Plaintiffs would have difficulty attracting potential new

insurers.  (See id.)  CI asserts that, as an accommodation to HMK and the Plaintiffs, it

agreed to forego issuing a notice of "nonrenewal" of Plaintiffs' WCI and CP Policies.

(See id.)  As reflected in email correspondence between CI and HMK, HMK expected to

secure Plaintiffs' WCI and GL coverage with a new insurer or insurers for the 2011-12

policy period.  (See Hacker Aff. Ex. C; Runkle Aff. Ex. A.)  In fact, HMK presented

Plaintiffs with insurance quotes from other insurers by January 2011, which was prior to

the 60 day notice requirement for policy nonrenewal.  (See id.)  Moreover, it was

understood at the time that if Plaintiffs did not move their coverages to another insurer,

they would continue to be insured by CI on terms offered by it in a renewal bid.  (See

Hacker Aff. Ex. C.)

23.    CI failed to issue and deliver to Plaintiffs insurance policies superseding the

insurance policies that expired on April 1, 2011.  (Bauer Decl. ¶ 8.)  CI admits that it did

not "deliver" superseding insurance policies, but denies that it failed to "issue"

superseding policies.  CI incorporates its response to PSOF ¶ 22.

24.    CI affirmatively elected not to renew, inter alia, Plaintiffs' WCI and GL coverage

for the 2011-2012 policy period.  (PSOF Ex. F, Aug. 15, 2013 Dep. of A. Bauer ("Bauer

Dep.") 107:23-108:6; PSOF Ex. G, Apr. 25, 2011 K. Runkle Email to D. Carrito ("This

policy was not renewed by Cincinnati, effective 04-01-11"); PSOF Ex. H, CI's Notes for
Audit of Siteline's 2010-11 WCI Policy at CIC00112 ("WE DID NOT RENEW THIS
ACCOUNT – EXPIRATION 4-1-11") and CIC00118 (same).)

25.     Plaintiffs assert that CI did not provide them with any written notice of its election
not to renew the WCI and GL coverage for the 2011-12 policy period. (Niswender Dep.
at 147:23-148:3; Bauer Decl. ¶ 9.).  CI denies this assertion, incorporating its response to
PSOF ¶ 22.

26.     Plaintiffs never notified or expressed to CI that they did not want their insurance
coverage with CI, or any portion thereof, renewed for the 2011-12 policy period.  (Bauer
Dep. at 206:22-207:4; Bauer Decl. ¶ 10.)  CI denies this assertion, incorporating its
response to PSOF ¶ 22.

27.     Plaintiffs assert that they never notified nor did they express to their insurance
broker/agent at HMK or any other entity that they did not want their insurance coverage
with CI, or any portion thereof, renewed for the 2011-12 policy period.  (Bauer Dep. at
206:22-207:4; Niswender Dep. at 147:1-9; Bauer Decl. ¶ 11.)  CI denies this assertion,
stating that Plaintiffs chose new insurers to provide WCI and GL policies through a new
insurance broker, EHD.  (See Niswender Dep. at 35:7-10, 40:14-44:9.)  CI asserts that
this demonstrates that Plaintiffs chose to seek insurance coverage from a different insurer
for the 2011-12 policy period.  (See Hacker Aff. Exs. C, D.)

28.     Plaintiffs assert that they never authorized HMK or any other entity to represent to
CI or any other party that they did not want their insurance coverage with CI, or any
portion thereof, renewed for the 2011-12 policy period.  (Niswender Dep. at 134:12-22;

135:1-6; Bauer Decl. at 12.)  CI denies this assertion for the same reasons it denies PSOF ¶ 27.

29.    CI's lack of timely notice that it would not renew Plaintiffs' insurance coverage for the 2011-12 policy period resulted in Plaintiffs having only a short time to decide on alternative coverage from among the few insurers who provided quotes.  (Bauer Decl. ¶¶ 13-14.)  CI denies this assertion, incorporating its response to PSOF ¶ 22.

30.    Each GL Part of Plaintiffs' CP policies with CI contained language specifying that CI "[would] compute all premiums for this Coverage Part in accordance with our rules and rates."  (See PSOF Ex. 1, Excerpt from 2007-10 CP Policy, Commercial GL Coverage Part Form at 15, Sec. IV.6.a.)

31.    During the time Plaintiffs were covered by CI, they were required to pay and did pay eligible employees who performed work on their public contracts minimum wages equal to  locally prevailing wages and benefits, including prescribed prevailing fringe benefits, specified in the public works contracts, pursuant to the Pennsylvania Prevailing Wage Act, 43 P.S. §§ 165-1, et seq.) and other governing Federal, state, and local laws. (See Bauer Decl. ¶ 15.)

32.    In addition to contributions to group pension and medical insurance plans, Plaintiffs paid the remaining portion of the prevailing fringe benefit owed to each employee in the form of DCFB, an option permitted by governing prevailing wage law. (Id. ¶ 16; see 29 C.F.R. §§ 5.20, et seq.; 34 Pa. Code §§ 9.103(1), 9.106(b); see also 34 Pa. Code § 9.102 (defining "[c]ontributions for employee benefits" to include "fringe benefits . . . including payment made whether directly or indirectly, to the workmen").)

33.     When Plaintiffs first obtained coverage with CI, CI included DCFB as a

component of Plaintiffs' payrolls when calculating premiums for WCI and GL coverage.

(Bauer Dep. at 102:8-15.)  CI denies this assertion as stated; see response to PSOF ¶ 35.

34.     In 2001, it was discovered that CI had been including DCFB in its WCI and GL

premium calculations.  (Bauer Decl. at ¶ 18.)

35.     As a result, CI corrected its audits for the 1998-99 and 1999-2000 policy periods

in "Final Audit Correction Statements," providing Plaintiffs a credit for the portion of the

premiums they paid that were traceable to CI's inclusion of DCFB, and excluded such

benefits from its WCI or GL payroll calculations for nine successive years thereafter.

(Bauer Dep. at 96:17-97:10, 102:8-15; Bauer Decl. ¶ 19; PSOF Ex. K, 2001 WCI Final

Audit Correction Statements; 2001 GL Liability Premium Adjustment Statements (also

attached at Ex. K); PSOF Ex. L, Cumulative Pre-2010 Cincinnati Audit Account

Notes/General Notes (referencing July 2001 phone conversation); see also PSOF Ex. M,

Plaintiffs' First Requests for Admission Directed to Defendants ("Plaintiffs' RFAs") ¶

71; PSOF Ex. N, Defs' Resp. to Plaintiffs' RFAs ¶ 71.)

        CI denies the assertions in PSOF ¶¶ 33-35.  It admits that it modified its audits for

the 1998-99 and 1999-2000 policy periods and supplied Plaintiffs with Final Audit

Correction Statements.  It denies Plaintiffs' contentions as to the reasons for the audit

corrections and any credit that may have been applied to Plaintiffs' audited premium

calculations.  (See PSOF Ex. K.)  CI admits that it excluded DCFB from the WCI and

GL coverage payroll calculations in each of the following nine years, but contends that

this was done in error with respect to GL coverage payroll calculations, and was

corrected by it as of the 2010-2011 audit. (See Bauer Dep. at 99:1-101:25; PSOF Ex. 10, August 31, 2011 C. Cooke Email to A. Bauer w/ attachments; Hacker Aff. Ex. D.)

36.     Plaintiffs assert that CI excluded DCFB from Plaintiffs' payrolls for premium calculation purposes for the following decade, which was reflected annually in either the "Account Notes" or "General Notes" section of CI's annual internal audit workpapers. (See PSOF Ex. L (paragraphs beginning either with "Did do some prevailing wage work . . ." or "FRINGE BENEFITS TAKEN OUT OF DAVIS BACON WAGES . . .").)  CI denies this assertion, since the exclusion of DCFB from premium calculations was corrected by the 2009-10 audit.  (See Bauer Dep. at 99:1-101:25; Niswender Dep. at 91:18-24,132:13-133:25; PSOF Ex. 10, August 31, 2011 C. Cooke Email to A. Bauer w/ attachments; Hacker Aff. Ex. D.)

37.     As of the time of CI's 2010 audit of Plaintiffs' 2007-10 CP Policy, CI began re-including the value of the Plaintiffs' DCFB payments into its calculation of Plaintiffs' payroll expenditures for GL coverage premium purposes.  (Plaintiffs' RFAs ¶ 72; Defs.' Resp. to Plaintiffs' RFAs ¶ 72.)

38.     CI included the value of the DCFB into its calculation of Plaintiffs' GL coverage premiums for the 2010-11 CP Policy as well.  (Bauer Dep. at 96:17-97:19.)

39.     Prior to re-including the value of DCFB into its calculation of Plaintiffs' GL premiums, CI did not notify Plaintiffs of its decision to include the value of these fringe benefits.  (Plaintiffs' RFAs ¶ 73; Defs.' Resp. to Plaintiffs' RFAs ¶ 73.)

40.     As of the time CI began to once again include Plaintiffs' DCFB payments in its calculation of Plaintiffs' payroll for GL coverage premium purposes, CI did not notify

Plaintiffs that the value of these fringe benefits would be included.  (Plaintiffs' RFAs ¶ 74; Defs.' Resp. to Plaintiffs' RFAs ¶ 74.)

41.    CI did not provide Plaintiffs, at any time while Plaintiffs were covered under GL insurance with CI, notice that CI would include in its calculation of Plaintiffs' payroll for GL coverage premium purposes the DCFB that Plaintiffs paid their employees. (Plaintiffs' RFAs ¶ 75; Defs.' Resp. to Plaintiffs' RFAs ¶ 75.)

42.    CI did not provide Plaintiffs, at any time while Plaintiffs were covered under GL insurance with CI, oral or written justification of its decision to include in its calculation of Plaintiffs' payroll for GL coverage premium purposes the DCFB that Plaintiffs paid their employees.  (Plaintiffs' RFAs ¶ 76; Defs.' Resp. to Plaintiffs' RFAs ¶ 76.)

43.    Plaintiffs did not discover CI re-inclusion of the DCFB in its calculation of Plaintiffs' payroll for GL coverage premium purposes until mid-2011, after Plaintiffs' coverage with CI had already ended, when it reviewed CI's final audit for the 2010-11 CP Policy.  (Bauer Dep. at 96:17-97:19, 102:21-103:19; Niswender Dep. at 132:18-133:25.)

44.    Plaintiffs assert that when they sought an explanation for the change, CI's auditor claimed his supervisor instructed him to change the method of calculation, based on claimed interpretation of the manual governing Plaintiffs' GL insurance.  (Bauer Dep. at 97:23-98:7.)  CI denies this, and asserts that its explanations for the change were contained in two correspondence from it to Plaintiffs.  (See PSOF Exs. O, P.)

45.    Plaintiffs assert that CI contended that, whereas "fringes . . . are specifically addressed in the PA Workers Compensation manual and excluded," the "General

Liability manual does not specifically address fringes" and "[s]ince they are not specifically excluded, they are included as wages."  (PSOF Ex. O, Aug. 31, 2011 Email String (w/ attachment).)  CI admits that Plaintiffs have correctly quoted a selected excerpt of the language from the Aug. 31, 2011 email, except that Plaintiffs have incorrectly omitted the word "remuneration/" from in front of the word "wages."  (See id.)

46.     In October 2011, CI claimed that its nearly decade-long policy of "subtracting . . . fringe benefits out of the liability payroll . . . was an error" and "there would be no revision to the inclusion of the fringe benefits" in the audited premium for Plaintiffs' GL coverage insurance coverage.  (PSOF Ex. P, Oct. 24, 2011 A. Hacker Email to A. Bauer.)

47.     Plaintiffs paid all deposit premiums due and owing in connection with the 2010-11 W/C and CP Policies.  (See PSOF Ex. Q, 2010-11 W/C and CP Policy Premium Audits.)

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of

proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

25

III.    **DISCUSSION**

A.      **Plaintiffs' Motion for partial summary judgment**

Plaintiffs argue that they are entitled to partial summary judgment on their affirmative defenses to CI's Counterclaim for nonpayment because the record establishes that for each year that they had WCI and CP coverage with CI, CI breached its contracts by failing to provide them with timely notice of an increase in their premiums.  Second, they assert the summary judgment record establishes a breach based on CI's failure to timely provide them with a statutorily required notice of its election not to renew their WCI and GL coverage.  Third, they assert that the summary judgment record establishes that CI breached its contracts when, without notice or explanation, and in contravention of the parties' decade-long course of dealing and course of performance, it began to re-include the value of DCFB payments into its calculation of Plaintiffs' payrolls for GL premium purposes.  Accordingly, they assert that CI's breaches discharged their responsibility to pay any additional premiums.

CI makes several arguments in response.  First, it asserts that Plaintiffs improperly seek to "pursue a private right of action under the Pennsylvania Insurance Code and regulations."  (Defs.' Mem in Opp. to Pls. Mot. for Summ. J. at 2.)  The Pennsylvania Legislature, it contends, has empowered the Insurance Commissioner with discretionary authority to issue regulations, pursue complaints, and enforce the various provisions of the insurance laws of the Commonwealth.  It argues that there is no private right of action for alleged violations of the Insurance Code.  Second, even if a private right of action exists, CI argues that the Plaintiffs' insurance policies contained audited premium

26

agreements, providing for initial estimated premiums based upon expectations about the amount of payroll each company would actually carry, to be followed by an audit process after each policies' end date to determine the final amount of the actual payroll and the resulting final premium.  It argues that Plaintiffs improperly ignore these provisions in asserting the claim based on a lack of notice of increase in premiums.  CI argues (1) that Plaintiffs bear the burden of proof regarding their notice argument; (2) that the "real" premium was the post-audit premium, not the estimated premium; and (3) that Plaintiffs have failed to come forward with evidence to show that the final premium amounts increased on renewal as alleged.  Third, CI concedes that its own failure to include the DCFB value in the calculation of GL coverage premiums was an error in Plaintiffs' favor.  It argues, however, that Plaintiffs were never legally entitled to the discounted premium, and CI had no legal duty to continue to calculate the premiums erroneously.  It argues that the case law concerning course of dealing does not support Plaintiffs' position and that Plaintiffs had no reasonable basis to believe that DCFB would be in or out of the GL coverage premium calculation.  Finally, CI argues that Plaintiffs have failed to demonstrate that they are legally excused from paying the premiums due under the audited premium agreements.

          1.   <u>Plaintiffs' have a right to assert their affirmative defenses against CI's Counterclaim</u>

Preliminarily, I find that CI's assertion that Plaintiffs have no "private right of action under the Pennsylvania Insurance Code" misstates Plaintiffs' position.  They are not asserting a "right of action" based on violation of the Insurance Code; they are

asserting the alleged violation as an affirmative defense to CI's Counterclaim.  CI argues

that only the Pennsylvania Insurance Commissioner has the authority to enforce

provisions of the Pennsylvania Insurance Code, including the provisions requiring

insurers to provide notices of premium increases and notices of non-renewal of policies.

I conclude that CI's argument is meritless because the case upon which it relies does not

provide authority for its assertion, is not binding authority, and is largely inapposite to

Plaintiffs' affirmative defenses to CI's Counterclaim.

In L.S.S. Realty Corp. v. Liberty Mut. Ins. Co., 58 Pa. D. & C. 4th 44 (Lehigh Cty.

Ct. of Comm. Pleas 2002), the decision cited by CI, the plaintiff sought to enjoin the

insurer from refusing to renew a property insurance policy.  The Lehigh County Court of

Common Pleas[1] determined that "[b]ecause plaintiff's petition centers on an alleged

noncompliance with the insurance laws of the Commonwealth, which are overseen by the

Commonwealth's Insurance Department, jurisdiction lies administratively.  Therefore,

plaintiff's petition for an injunction is dismissed."  Id. at 45.  The case raised a pure issue

of state court jurisdiction to grant equitable relief; thus, the case is inapposite to any

assertion that Plaintiffs are barred from raising an affirmative defense (or that we

somehow lack jurisdiction to consider that affirmative defense) that CI's violation of the

_____

[1]  Lower state court decisions are persuasive, but not binding, on a federal court's authority if the
State's highest court has not spoken on a particular issue.  See Packard v. Provident Nat. Bank,
994 F.2d 1039, 1046 (3d Cir. 1993); Smith v. Whitmore, 270 F.2d 741, 745 (3rd Cir. 1959).  I
may look to trial court or intermediate appellate court opinions as "indicia" of the highest court's
likely decision.  McNasby v. Crown Cork & Seal Co., 888 F.2d 270, 281 (3d Cir. 1989);
Scranton Dunlop, Inc. v. St. Paul Fire & Marine Ins. Co., Civ. A. No. 00-2138, 2000 WL
1100779, at *1 (E.D. Pa. Aug. 4, 2000) ("Since this is a matter of state law that has not been
decided by the Pennsylvania Supreme Court, a prediction must be made as to how that court
would rule if confronted with the same facts.").

Insurance Code excuses Plaintiffs' nonpayment of the outstanding premium.

Specifically, the Common Pleas Court stated that the gravamen of the complaint before it sought injunctive relief asserting the insurer had not complied with notice requirements of the Insurance Code because the notice issued by the insurer failed to state the specific reasons for non-renewal of the policy in violation of 40 P.S. § 3403(a).  It held that where

> an insured alleges activities by the insurer that constitute violations of the Act (e.g., failure to comply with non-renewal provisions of section 3407), it is improper to judicially create private causes of action under the Act.  **On the other hand, given the fact that the commissioner's jurisdiction is not exclusive in cases involving causes of action arising independently of the insurance laws, common-law suits, involving claims such as fraud and deceit, are not precluded**.

Id. at 50-51 (emphasis added).  Here, Plaintiffs seek to assert common law affirmative defenses to CI's claim for breach of contract.  They are not seeking an injunction forcing the insurer to continue to provide coverage.  Thus, even under the authority cited by CI, I perceive no bar to Plaintiffs right to raise an affirmative defense to CI's nonpayment claim based on CI's own inequitable conduct.

### 2.  Affirmative defense based on lack of notice

Plaintiffs assert affirmative defenses to CI's Counterclaim for nonpayment based on (1) CI's failure to provide notice of premium increases and (2) CI's failure to provide notice of cancellation.

### a.  Notice of insurance renewal premium increases

Under Pennsylvania insurance regulations, insurers are required to provide insureds with notice of premium increases when commercial policies are renewed.  See

31 Pa. Code § 113.82 (stating that insurers "shall provide the named insured advance notice of any increase in renewal premium at least 30 days before the upcoming policy renewal date").  In their statement of undisputed facts, Plaintiffs assert that they did not receive any notice of an increase in their insurance renewal premiums for the 2011-12 policy period.  (<u>See</u> PSOF ¶ 22 (citing Bauer Decl. ¶ 7).)  Alfred Bauer, President of Baseline and Secretary of Siteline, has averred that CI never sent Plaintiffs a renewal premium increase notice by registered or first class mail, or in any other form, during the years that CI issued insurance policies to Plaintiffs.  (Bauer Decl. ¶ 6.)

CI admits that Plaintiffs did not directly receive an insurance renewal premium notice for the 2011-12 year, but asserts that it was not required to send one because it had already conveyed to Plaintiffs' insurance broker, HMK, that it no longer wished to write these types of insurance to companies involved in road construction contracting.  (<u>See</u> Ex. 4 to Defs.' Resp. to PSOF, Runkle Aff. Ex. A; Ex. 2 to Defs.' Resp. to PSOF, Hacker Aff. Ex. C.)  This was done at least one year in advance of the April 1, 2011 renewal date for the 2011-2012 period.  (<u>See</u> Runkle Aff. Ex. A.)  CI asked HMK to move Plaintiffs' WCI policies to a different insurer prior to the renewal for the 2011-12 policy period.  (<u>See</u> <u>id.</u>)  CI had also repeatedly asked HMK as early as a May 27, 2010 in writing to move Plaintiffs' CP policy to a different insurer prior to the renewal for the 2011-12 policy period.  (<u>See</u> Hacker Aff. Ex. C; Runkle Aff. Ex. A.)

As the summary judgment record is undisputed that Plaintiffs, through their broker, were on notice that the 2011-12 coverages for WCI and CP would not be renewed, Plaintiffs have failed to meet their summary judgment burden on their

30

affirmative defense that CI violated the Policy's notice of premium increase requirement as a matter of law.  CI had no duty under the Policy or the Insurance Code to provide the notice of the next year's premium because (1) it had informed Plaintiffs that there would be no policy issued for the next year, and (2) Plaintiffs actually moved their coverage to another insurer.

I find that Plaintiffs have also failed to meet their summary judgment burden on their "lack of increase in premium notice" affirmative defense for the other years in which the policy was in effect.  Their assertion that CI was required to send a yearly notice that the premium would increase ignores the nature of the insurance at issue and the specific policy language governing how rates would be charged.  The record is undisputed that the insurance contract provided for audited premiums.  (DSOF Ex. 6, Aff. Of Bill Janson; Niswender Dep. at 45:17-51:19, 90:2-22, 93:18-96:1.)  Under such an arrangement, the insured pays an estimated premium at the outset of coverage.  (Janson Aff.; Niswender Dep. at 45:17-51:19, 90:2-22, 93:18-96:1.)  The audit then establishes the precise payroll base for the yearly premium, and a reconciliation determines whether the insured is owed a refund or owes a further premium.  (Niswender Dep. at 45:17-51:19, 90:2-22, 93:18-96:1.)  Each yearly policy provided:

> The premium shown on the Information Page, schedules, and endorsements is an estimate.  The final premium will be determined after this policy ends by using the actual, not the estimated premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.  If the final premium is more than the premium you paid to us, you must pay the balance.  If it is less, we will refund the balance to you.  The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

(Janson Aff. Ex. C at 4.)  Plaintiffs have failed to establish that the mathematical formula under which each year's premium was calculated ever changed over the course of their relationship with CI.  Because the actual premium for any given year's policy was based on Plaintiffs' payroll, at the outset of any policy period it was just as likely that a premium could decrease as well as increase since Plaintiffs' own yearly payroll could decrease or increase.  Since Plaintiffs do not attempt to show that the mathematical formula under which each year's premium was calculated ever changed over the course of their relationship with CI, they cannot show as a matter of law that CI "raised" the premium, and thus had a duty to provide a notice of premium increase.  Accordingly, I conclude that Plaintiffs' affirmative defense based on the failure to provide a notice of premium increase is legally meritless.

### b.  Notice of insurance cancellation

Insurers are also required to provide notice of midterm cancellations and nonrenewal of coverage.  See 40 P.S. § 3403.  This notice must be sent by first class mail or delivered directly to the insured at least sixty days in advance of the effective date of the termination.  40 P.S. § 3403(a)(1)-(2).  The statute provides that, absent proper notice, coverage remains in effect unless the insured obtains replacement coverage, upon which the obligation to continue coverage ceases.  40 P.S. § 3403(b).

I find that Plaintiffs have failed to show they are entitled to summary judgment with respect to their affirmative defense regarding the policy cancellation notice.  While Bauer asserted that Plaintiffs did not directly receive notice of CI's election not to renew the policy for the 2011-12 policy period within thirty days of the April 1, 2011 renewal

date, the summary judgment record is undisputed that:  (1) Plaintiffs' broker HMK

received timely notice that CI did not want to renew the coverages; (2) HMK asked CI

not to send a notice of nonrenewal because it believed such a notice would harm

Plaintiffs' attempts to secure replacement coverage; (3) Plaintiffs' coverage was moved

to another insurer and they had replacement coverage lined up by mid-January 2011; (4)

Plaintiffs secured replacement coverage for about $100,000 less than CI's 2010-11

premium; and (5) Plaintiffs voluntarily decided to move coverage to another insurer.

(See Hacker Aff. Ex. C.)  I conclude that the statutory notice requirement cannot excuse

Plaintiffs' duty to pay the outstanding premium under these circumstances.  The statute

merely requires that coverage remain in effect unless the insured obtains replacement

coverage, after which the obligation to continue coverage ceases.  40 P.S. § 3403(b).  The

statute does not excuse the insured from paying for the continued coverage, let alone

from paying for the coverage provided by the expiring policy.  As it is undisputed that

Plaintiffs had actual notice through their agent, and obtained replacement coverage,

nothing in Section 3403(b) bars CI from collecting the unpaid premium.

3. Count II's Claim for injunctive relief and Plaintiffs'
Affirmative Defense based on the re-inclusion of
DCFB into GL coverage premium calculation

Next, Plaintiffs argue they are entitled to summary judgment on their claim for

injunctive relief and on their affirmative defense based on CI's re-inclusion of DCFB

payments into GL premium calculations.  They argue that the parties' course of dealing

and course of performance established a "mutual understanding" that DCFB payments

were not part of employee wages upon which the GL coverage premium was to be

33

calculated.  (Pls.' Mem. at 11.)  I find that Plaintiffs' course of dealing arguments are meritless.

"When interpreting the terms of an insurance contract the court must generally attempt to effectuate the intent of the parties as manifested by the language of the written instrument."  Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 206 (3d Cir. 2001) (citations omitted).  The United States Court of Appeals for the Third Circuit has noted that under Pennsylvania law we "must examine the totality of the insurance transaction involved to ascertain the reasonable expectation of the insured."  Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3rd Cir.1994) (citing Everett Cash Mut. Ins. Co. v. Krawitz, 633 A.2d 215, 216 (Pa. Super. Ct. 1993)).

> In Pennsylvania,
>
> The standards to be applied in reviewing [an insurance] contract are well settled.  First, the words included in the instrument must be given their ordinary meaning. . . .  Second, ambiguous terms in an insurance policy should be construed against the insurer. . . .  Third, a term is ambiguous only "if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning." . . .  Fourth, the parties true intent must be determined not only from the language but from all the surrounding circumstances.

United Servs. Auto. Assoc. v. Elitzky, 517 A.2d 982 (Pa. Super. Ct. 1986) (quoting Erie Ins. Exch. v. Transamerica Ins. Co., 507 A.2d 389, 392 (Pa. Super. Ct. 1986)); see also Mohn v. Am. Cas. Co. of Reading, 326 A.2d 346 (Pa. 1974) (citing Burne v. Franklin Life Ins. Co., 301 A.2d 799 (Pa. 1973) ("Furthermore, where the contact is one of insurance any ambiguity in the language of the document is to be read in a light most strongly supporting the insured.").  A cornerstone principle of contract interpretation

provides that where the words of the document are clear and unambiguous, we must "give effect" to the language. Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983); Mace v. Atl. Refining Mktg. Corp., 785 A.2d 491, 496 (Pa. 2001).

It is an established principle of contract construction that "subsequent conduct of the parties, course of performance, is an aid to interpretation." Herzog v. Herzog, 887 A.2d 313, 316 (Pa. Super. Ct. 2005). Thus, when contracting parties perform under the contract, "their performance manifests a common manifestation of their understanding of the prior expression of agreement, [and] this evidence will be given great weight in determining the meaning attributed to their expressions." Id. (quoting Murray on Contracts, 3d e., § 88A, at 424). The parties' "course of dealing reflects the parties' own interpretation of [the] insurance policy, and it is very relevant to our analysis". Bowersox Truck Sales and Serv., Inc. v. Harco Nat. Ins. Co., 209 F.3d 273, 279 (3d Cir. 2000); see also Tindall v. Friedman, 970 A.2d 1159, 1166 (Pa. Super. Ct. 2009) ("It is an established principle of contract construction that 'subsequent conduct of the parties, course of performance, is an aid to interpretation.' . . . Thus, when contracting parties perform under the contract, 'their performance manifests a common manifestation of their understanding of the prior expression of agreement, [and] this evidence will be given great weight in determining the meaning attributed to their expressions.'" (internal citation omitted)).

Plaintiffs' course of dealing argument emphasizes that their successive CP policies were facially silent regarding whether CI could or would factor DCFB payments into

their payroll for GL coverage premium purposes.  According to Plaintiffs, the only

relevant language in the CP policy that addressed how CI calculated GL premiums stated

that CI would "compute all premiums for this Coverage Part in accordance with our rules

and rates."  (Pls.' Mem. in Support of Mot. for Summ. J. at 11 (quoting PSOF Ex. I,

2010-11 CP Policy, GL Coverage Part Form at 15, § IV.6.a.).)  Plaintiffs note that (1) CI

claimed it relied upon its General Liability Manual, as well as insurance industry

publications, in making its decision to re-factor the DCFB benefits into the premium

calculation; (2) CI asserted that this manual's silence on the subject of DCFB permitted

such re-inclusion in contravention of its earlier course of dealing; and (3) CI re-included

the DCFB without any notice to Plaintiffs.  (Id. at 13.)

 Plaintiffs argue that under Pennsylvania law, where an agreement is silent on a

particular term, course of dealing and course of performance may fill the void to

supplement or qualify the terms of the parties' agreement and provide interpretive

guidance.  (Id. at 14 (citing IAP Worldwide Servs., Inc. v. UTi United States, Inc., Civ.

A. No. 04-4218, 2006 WL 305443, at *8 (E.D. Pa. Feb. 8, 2006) (applying New York

law).).  They contend that when CI's original inclusion of DCFB in the GL coverage

premiums was discovered, CI responded by correcting its audits for the 1998-99 and

1999-2000 policy periods, provided a credit for the portion of those years' premiums

traceable to the erroneous inclusions, and for the next decade excluded DCFB when

calculating GL coverage premiums.  (Id. at 14 (citing Bauer Dep. at 96:17-97:10, 102:8-

15; Bauer Decl. at ¶ 19; 2001 WC Final Audit Correction Statements).)  Plaintiffs argue

that this was a consistent course of dealing in the seven years prior to the 2007-10 CP

policy that established (1) the parties' clear mutual understanding and intent that CI

would not factor DCFB into the GL coverage payroll calculation; (2) Plaintiffs'

reasonable expectation that the parties' mutual understanding would continue; and (3) if

CI wished to change the essence of their bargain, it would notify Plaintiffs of the change

and afford them the opportunity to decide whether to accept CI's proposed modification.

(Id. at 15.)  Plaintiffs conclude that because there is no genuine dispute of material fact

regarding CI's conduct in excluding DCFB in the GL coverage premium payroll

calculation and then re-including it with no notice, they are entitled to summary judgment

on their claim for injunctive relief and on their affirmative defense to CI's nonpayment

breach of contract claim.

CI responds that Plaintiffs have only shown that it erroneously charged them a

lower GL coverage premium than it should have for the years 2001-2009.  It contends

that Plaintiffs' argument that CI was required to continue to erroneously calculate the

premium is meritless because it had no legal duty to perpetuate the calculation error.  CI

distinguishes Plaintiffs' course of dealing argument, asserting that the cases upon which

Plaintiffs rely all involve mutual knowledge of the facts of the course of dealing, and all

deal with the interpretation of ambiguous contract or policy language.  CI asserts that

there was no mutual knowledge here because the DCFB was excluded in error from the

GL premium calculation, and Plaintiffs conceded they did not know, one way or the

other, whether the exclusion was correct or erroneous during the period it was excluded.[2]

Accordingly, CI asserts that Plaintiffs cannot claim they relied upon the calculation error.

It also asserts there was no ambiguity because the policy was silent on whether DCFB

would be included.

I find that Plaintiffs have failed to meet their summary judgment burden on their

claim for injunctive relief and on their affirmative defense to CI's Counterclaim for

nonpayment.  First, their argument that the GL coverage was "facially silent" on how the

premium would be calculated is not supported by the summary judgment record.  Indeed,

Plaintiffs admit that the policy does specify the basis for the premium calculation.  It

provides:

> All premium for this policy will be determined by our manuals of rules,
> rates, rating plans and classifications.  We may change our manuals and
> apply the changes to this policy if authorized by law or a governmental
> agency regulating this insurance.

. . .

> Premium for each work classification is determined by multiplying a rate
> times a premium basis.  Remuneration is the most common premium basis.
> This premium basis includes payroll and all other remuneration paid or
> payable during the policy period . . . .

(Janson Aff. ¶ 11 (quoting DSOF Ex. 1, Part Five – Premium at A, C).  Because the

policy makes clear that:  (1) GL coverage premiums are based on remuneration; (2)

remuneration includes both payroll and "all other remuneration paid or payable during

the policy period;" (3) premiums will be determined by CI's manuals; and (4) those

---

[2]  While CI asserts there was no mutual knowledge of facts of the course of dealing because its
auditor discovered the error and re-included the DCFB in the GL coverage premium, this appears
to be disputed and I do not rely upon the assertion in my analysis.

manuals could be changed and made applicable to the policy so long as they were authorized by law or regulation, I conclude that Plaintiffs have no basis to assert that CI's error was written in stone for all time and that the insurer was barred from ever correcting the error.  Notwithstanding CI's own error, the policy provisions governing the premium calculation are clear and unambiguous.  Remuneration includes payroll and all other remuneration paid by the employer to its employees.  Because the provision is clear and unambiguous, I must give effect to that language, and cannot consider the parties' course of dealing and course of performance as an aid to interpretation.  Accordingly, Plaintiffs could have no reasonable expectation as a matter of law applicable to the erroneous exclusion of DCFB from the GL coverage premium.  I conclude, therefore, that Plaintiffs' claim for injunctive relief and their affirmative defense to the nonpayment counterclaim based on the re-inclusion of the DCFB into the GL coverage premium are legally meritless.

### B. CI's Motion for Summary Judgment on Plaintiffs' Amended Complaint and on its Counterclaim for Breach and Unjust Enrichment for Non-payment of Premiums

In its Motion, CI argues that it is entitled to summary judgment on the breach of contract claim contained in Count I of Plaintiffs' Amended Complaint, the request for injunctive relief contained in Count II, and on its Counterclaim for breach of contract based on Plaintiffs' non-payment of the audited premium.  It argues that it is undisputed that the policy called for estimated premiums at the outset of coverage based on estimated payroll, an audit to establish precise payroll, and a reconciliation causing either a refund to the policyholder or a further payment due.  Following the audit, CI billed Plaintiffs for

unpaid premiums based on the payroll audit, and Plaintiffs do not contest the payroll data. CI contends that Plaintiffs are attempting to avoid paying the premium by claiming that CI mishandled WCI claims, adversely affecting Plaintiffs' loss experience, and thus their premiums, as well as contending that DCFB should not have been included in the premium calculation, which was discussed and rejected above.  Regarding the alleged mishandling of WCI claims, CI argues that claims identified by Plaintiffs are not timely and, accordingly, cannot serve as a basis for an affirmative defense to the nonpayment of the premium.

Plaintiffs respond that, while CI asserts that the WCI claims involving William Booth, Michael Reinoehl, and Jeffrey Moser are untimely, it makes no argument regarding the other two WCI settlements that Plaintiffs allege were mishandled, namely the claims of Leo Schappe and Frank Calabro.  As to the Booth, Reinoehl and Moser claims, however, Plaintiffs point to no facts and offer no argument why those claims are timely.  Accordingly, insofar as Count I of the Amended Complaint asserts a breach by CI based on its handing of these three WCI claims, I find that Plaintiffs have failed to meet their summary judgment burden to make a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

Plaintiffs are correct, however, that although CI seeks summary judgment in its favor on the entirety of Count I of the Amended Complaint, its own Counterclaim, and Plaintiffs' affirmative defenses, it has made no effort to meet its summary judgment burden with respect to the lack of timeliness of the allegedly mishandled claims involving

Leo Schappe and Frank Calabro.  As those two claims also form part of the basis of Plaintiffs' breach of contract claim, I find that there remain genuine issues of material fact whether those claims were mishandled, and whether that impacted the premiums Plaintiffs paid for their WCI coverage.  Accordingly, I conclude that the grant of summary judgment on Count I of the Amended Complaint, CI's Counterclaim, and Plaintiffs' affirmative defenses to CI's Counterclaim is inappropriate.

## IV.    CONCLUSION

In conclusion, CI is entitled to partial summary judgment on Count II of Plaintiffs' Amended Complaint seeking a declaration that it was improper to include the DCFB in the GL coverage premium.  I also find that CI is entitled to partial summary judgment on Plaintiffs' affirmative defenses to CI's Counterclaim that CI (1) failed to provide them with timely notice of an increase in their premiums; (2) failed to provide them with timely notice of its election not to renew their WCI and GL coverage; (3) improperly re-included the value of DCFB payments into its calculation of Plaintiffs' payrolls for GL coverage premium purposes; and (4) mishandled the Booth, Reinoehl, and Moser WCI claims, thereby discharging Plaintiffs' responsibility to pay their final audited premiums. I deny CI's Motion to the extent it involves the Schappe and Calabro WCI claims. Because Plaintiffs' affirmative defense regarding those two claims survives, CI is not entitled to summary judgment on its Counterclaim for nonpayment of the outstanding premiums.  Neither can I grant Plaintiffs summary judgment on those two surviving claims.  Although CI has not met its burden to show the Schappe and Calabro claims are untimely, neither have Plaintiffs met their summary judgment burden to affirmatively

show an absence of material fact that those claims were mishandled and impacted their WCI premium.

An appropriate Order follows.